Judge Newman is overruling me, and so I stand overruled. Would you like to speak first, Judge Newman? I have that in mind. Ms. Jones, will you come forward, please? It would be a great pleasure. I move the admission of Miranda Y. Jones to the bar of this court. Ms. Jones is a member of the bar in good standing of the highest court of Texas. I have knowledge, personal knowledge, of her credentials. I'm satisfied that she possesses the necessary qualifications, so with great pleasure I move the admission to this bar of Ms. Jones. Do we want to let any Texans into our bar? Do you think that's a good idea, once in a while? Once in a while. This one makes the cut? Okay. Then we grant the motion, and maybe our circuit executive could administer the oath. I swear and affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Thank you, Your Honor. Congratulations, and welcome to the bar of the United States Court of Appeals. Thank you, Ms. Jones. And indeed, we welcome you. Now our first case is Irby ELEKTROMEDIZIN v. CANADY TECHNO. Mr. Hampton. May it please the Court. I have asked for three minutes on the bus. Thank you. We'll be generous with that. Thank you very much. The issues before this Court today are somewhat different than were initially stated in the brief because of the corresponding related case, 2008-1358, where this Court rendered claims, or rendered claim construction, or some of the same claim construction that you were appealing. So there's only one claim construction left in the Court below, and that is the proper construction of the term flow rate. The other issue that we're appealing is whether or not the color blue is functional for APC probes and whether or not the color blue indicates that Irby is the source of those probes. Okay. The judge's claim to structure from below on low flow rate is wrong for four reasons. It finds prosecution history stopped where there was none. It disregards the specification that repeatedly talks about low flow rate in qualitative terms but not quantitative terms. It reads into an independent claim, limitations of an independent claim, so it violates the doctrine of claim differentiation. And also it incorporates a parameter, flow velocity, which was never discussed in the patent at all as a limitation in the claims of the patent. Okay. In response to the office action in this case, Irby just flat out that its invention was not made obvious by Mann-Waring or the Kennedy references. To demonstrate this, Irby set forth a hypothetical example showing what it did mean would be something that had a laminar jet-type flow. And I'll just quote the actual office action response. Irby said, and this is after they calculated the dimensions of a Kennedy probe, it said that a flow rate of one liter per minute would produce a flow velocity of 19 kilometers per hour. Taking the higher value of 12 liters per minute gives an outlet gas speed of 229 kilometers per hour. Such velocities would certainly be classified as laminar jets and would likely lead to the above problems. Well, aren't they disclaiming that then? They never clearly unequivocally disclaimed any flow rates. In fact, because the claims were only written as defined at low flow rate qualitatively. Well, that's not exactly right, right? Claim one does have a quantitative component. It does have a quantitative component, but in the specification itself, that is not... But are you asking us to read out that number from the claim language itself to ignore that? No, we're saying that you define low flow rates as not meaning less than one, but in claim one, they actually say a low flow rate, which doesn't have to be less than one, but for this claim is less than one. Because that's why in claim 30... But before the district court, you weren't just... The claim construction you were advocating was the same for both claim one and claim 35, but neither of which you ascribed a quantitative aspect. It still is, because again, we're saying we want to define low flow rate. Just the term low flow rate. The term low flow rate should mean the same in claim one and 35. It cannot in claim 35, meaning flow rate having a flow of less than one, because claim 38, the dependent claim, has that limitation. And therefore, we should read that quantitative limitation of claim one. Isn't that your position? No, it's still in claim one, but it's not part of the definition of low flow rate. You have a definition of low flow rate, and in claim one, we actually limited our own definition. No place in the application, the prosecution history, etc., did Irby ever limit what low flow rate meant. But it says likely lead to the above problems. Likely lead, and we maintain that that's referring only to the 229 kilometers per hour, because 229 kilometers per hour is 143 miles an hour, and I think that we would all understand that to be jet-like speed. 19 kilometers per hour is only 12 miles an hour, less than 12 miles an hour. Most people, particularly those of ordinary skill in the art, would not mean that to mean a laminar jet. Well, wait a minute. Let me make sure I understand. So you're saying there is a quantitative disclaimer, but it's limited to the next to the last sentence, taking the higher value. It's limited to 12 liters? Even that is not really a quantitative disclaimer, because that is an example of a hypothetical probe. We are saying that any probe, hypothetical probe, that comes up with a flow rate of 143 miles an hour, we agree is a laminar jet. But because you don't go from laminar to non-laminar, at a step function, we understand that there are some flow rates of more than one that would produce a low flow rate as we define it quantitatively. And another reason why, and again, I did not write this patent. Well, let me ask you one further question about that language. When the final language that you quoted says such velocities in Kennedy, what does the such refer to? Such velocities would be the 229 kilometers per hour. Mr. Hanson, was there any evidence, or the brief seemed to say that there was none, as to what the actual flow rate is in the accused device? I know we're still at summary judgment and that these studies perhaps hadn't been conducted, but there was an admission, was there not, that if the term was construed as limited to about one, then there would not be infringement. So there must have been some acknowledgement of a significant difference. I think that the problem came into 229 kilometers per hour because, remember, these devices plug into an Irby unit. They were only used with Irby units. Irby set the flow rates that would come out depending on the size of plugs. It had electronics in the probe and in the generator. So therefore, if you stuck, for example, a 1.5 millimeter probe, you couldn't, the machine automatically cut the flow rate. I think it was to like 0.6 liters per minute. So there would be infringement. We can never find, the issue became the 19 kilometers per hour because, again, the whole thing with rates and flow velocities is almost a red herring in this because, again, if you shift from a large diameter probe to a smaller diameter probe, even at the same flow rate, your flow velocity, at least in this case, would vary by a function of six because flow velocity varies by the square of the radius. Then I don't understand what the fuss is about. Well, the fuss is about that there was no disclaimer any place in the prosecution history of disclaiming any numerical flow rates. Any numerical flow rates that apply to the probes in question. There's nothing in the record that says we disclaimed it. And, in fact, the only disclaimer that is, is that if you produce a flow velocity of 229 kilometers per hour thereabouts, that's clearly a laminar jet and that's clearly outside of our invention. But then why the concession of infringement on the district court's claim construction? Was it simply to come up here on appeal? Well, yeah, if her claim construction is right on the 229 kilometers per hour, which is part of her claim. My construction was that it was limited to one. One. I thought it was less than 19. Or about one. She said at A20 in the record, she says a flow rate less than about one liter per minute and producing flow velocities of less than 19 kilometers per hour. And that's the problem that we have is the 19 kilometers per hour. But you conceded infringement under that construction because of the 2.3 probes. Because we could not show that the 2.3 probes operated at less than 19 kilometers per hour. In fact, Judge Ambrose herself in her alternative basis for infringement, where she talked about contributory infringement, even stated that at A75 that the affidavit of Dr. Vargo merely shows that one doctor has used the probes in a potentially infringing manner. And she footnoted that saying that there's no evidence that he used it at less than one liter per minute. So we believe that the right thing to do is that her claim construction is wrong. It has to be demanded back to her because she did not apply anything else to other than 19 kilometers per hour, one liter per minute. Thank you, Mr. Hampton. We'll restore you three minutes of rebuttal. All right? Thank you. Okay. Mr. DeWitt. May it please the Court, Timothy DeWitt, 24th Army Law Group, USA, on behalf of Kennedy Technology and Dr. Jerome Kennedy. I'd like to reserve one minute of rebuttal time. I'd like to start with the patent claims that Mr. Hampton addressed and perhaps respond to some of the questions. Doesn't the district court's reading of the low flow rate violate the doctrine of claim differentiation? No, it does not. And I'd say the reason is that the district court found basically there's a prosecution disclaimer. I think that Mr. Hampton referred to it as prosecution history estoppel, but it's really a prosecution disclaimer where during the prosecution, Dr. Kennedy's patent was cited as prior art, and Dr. Kennedy disclosed in his patent a flow rate range of one liter per minute to 12 liters per minute. And Irby came in and wanted to distinguish their patent from Dr. Kennedy's. So they're really trying to distinguish that whole range to say that their patent is— How do we know that looking at the operative language in the document? When it says such velocities in Kennedy, why isn't that fairly limited to just the 12 liters and the 229? Because if you have a prior art reference that discloses a range, and you're trying to distinguish your invention from that range, distinguishing your invention from the upper limit of that range does not make your invention non-obvious. You have to distinguish it from the entire range. So Mr. Hampton's reading would make no sense whatsoever because an argument that the upper limit of Kennedy's range is too high doesn't distinguish their claims from Kennedy's patent at all. What matters is the lower limit. Is that lower limit of one liter per minute, is that, as disclosed by Kennedy, a low flow rate? And they came in and they argued, no, it's not a low flow rate. So we would argue that that, in fact, is a prosecution disclaimer. It's very clear, and the district court was correct. The second thing I would note is that there was a question about whether there was evidence that there was no infringement at the one liter per minute. And we would take the position that, yes, in fact, there was. And the evidence came in the form of testimony from Harold Walbrink, who was the expert witness of Herbe and Kahneman. And in his deposition, which is in the appendix at page A4296, lines 13 to 18, there's a question, but you would agree that when Kennedy Technology Probe is used at one standard liter per minute, that it produces a laminar argon flow exiting the tube, correct? Answer, for the definition of the patent, yes. So Herbe's expert tested the accused product at one liter per minute and, in fact, found that it was laminar when the patent, in fact, requires a non-laminar flow. And even going further, one liter per minute was the default flow rate on the system that was being used. So when the person attaches it, it goes to the default flow rate of one liter per minute. Herbe's expert found that that was not infringing. In addition to that, there was testimony from Dr. Al Kawas at Georgetown Medical Center that he used the accused products at 1.6 liters per minute. And there can't be any question that 1.6 liters per minute is well above the one liter per minute. Going back to Judge Rader's initial question about claim differentiation, that would apply here. I mean, this is a classic example, correct, of having a dependent claim contain the numbers that were construed. So is your answer just that prosecution disclaimer trumps claim differentiation? Number one, I would say that, yes, it could. But number two, I would say that it isn't exactly clear because the claim language that Mr. Hampton refers to says less than about one liter per minute. So what they're looking at is if there's a prior art reference that comes in at 0.95, they can argue that less than about one liter per minute is lower than that. So I would say it doesn't necessarily have to trump it because here the district court's number one was at one liter per minute. But then the flow velocity is actually very interesting because the flow velocity is more of a clearness claim that in the prosecution they made the argument that by calculating the flow velocity, they can tell whether or not it's a laminar or non-laminar flow. And the district court found that that was the argument, so if the flow velocities are greater than that 19 kilometers per hour, it falls outside the claim because it's a laminar flow. And I would note that in the district court, the district court itself noted in its Markman opinion that Irving failed to address the argument in the Markman briefing, in the Markman hearing. So all of their arguments regarding prosecution disclaimer here were not raised in front of the district court. I'd like to move on briefly since Mr. Hampton did not have time to address the trademark, I will skip over that as well and leave it on the brief. But I do have a question about the trademark even though we didn't have time. Was there evidence that if, for instance, they were green or purple or whatever, they wouldn't be used or couldn't be used? I don't know that the evidence was that specific. Well, I picked the colors out of the air. I'm trying to pick colors that don't occur naturally in the body. I can tell you what the evidence was. The first thing is that this was a trademark on the supplemental register because it had been rejected by the trademark office. That wasn't my question. So it was on the supplemental register. So the burden was on Irving to prove non-functionality. I don't think the burden of proof changes with the supplemental register. I'll have to look up a case on that, but I believe that the burden of proof is that they have the burden of proof when it's on the supplemental register to prove validity of the trademark. They have the burden of proving secondary meaning perhaps to move to the principal register, but that's not the issue. Let me get to the evidence, since that was the question. I was asking about the distinctiveness of any color. I can tell you what the evidence was that was submitted by the two sides. I don't know that it was exactly that. Irving submitted a declaration from their CEO in which he alleged that a number of other colors could be used. Do you disagree with that? I would disagree with it. Why couldn't it be colored green? That way the customer would know which product he's using. Well, there's a couple of reasons for that. Number one, there's a very limited number of colors that will show up well on the camera because this is a video camera. It's endoscopic use, so colors that maybe would be visible. But that was my question, that only blue provides enough contrast inside the body? I would say that there was probably evidence that black also would show contrast. You say probably? There wasn't anything specific, but in fact Kennedy Technology, after this lawsuit was filed, got a new supplier and changed their color to black just to try to avoid it, and they found that that color worked fine. So I would say that would support the idea that the color black would in fact work. Well, and the declaration you're referring to said any color other than beige or red would. Right. That we would disagree with. But in addition to that, it's not just a question of whether the other colors would be used. We submitted evidence from third parties indicating that, in fact, blue was better than those other colors. Better for what? That was my question. It was better because it made the probe more visible on the television screen with the endoscopic probes. That's why I asked. Better than green? Better than purple? It wasn't specific. It just said that blue is used because it shows better visibility on the screen. That's why I asked. Better than what? Their advertising didn't say better than some other specific color. It just said we're using blue because that is the one that gives us the best enhancement on the screen. That's in their advertising? That was in the advertising of a third party. This is one of these things that lots and lots of companies use the color blue on endoscopic probes. And, in fact, the only other company that sells argon probes is ConVet. And ConVet sells an argon probe that's the same color blue as Urbex. Well, they have a licensing relationship. They do not. Maybe there's no reason to object. They don't have a license under the trademark as far as I know. No, but maybe nonetheless. I'm just trying to understand what's so unusual about what's so functional about blue. My understanding from the declaration of Dr. Kennedy, from the evidence producers, is that it makes the probe easier to see on the screen. Easier than what? Easier than pink? Well, there wasn't anything specific easier than any other color. Well, that's what I'm trying to understand. You asked us to put dispositive weight. The trial judge did put, apparently, dispositive weight on something or other, that there was something useful about only blue, such that any other device of any other source, whether or not the observer might be confused, has the absolute right to color it blue and not, let's say, purple. I was trying to pick a color that I think doesn't occur naturally in the body. Yeah. There wasn't any evidence about purple or all these other colors. The only evidence about other colors was, there was one declaration that had one sentence that said, these other colors could be used other than red and beige, and then there was evidence that Kennedy Technology did eventually have a black probe, and then there was evidence... Nobody disagreed with that? Nobody disagreed with which evidence? With what you were just relying on? No, I don't think anybody disagreed with the fact that Kennedy Technology had a black probe, but I think that we did take issue with, and Dr. Kennedy's declaration disagreed with, Herve's position that you could use any color other than red and beige. When you go out in the marketplace and you look at what color probes people are using, almost all of them are blue, and we submitted evidence that all these different companies are blue. I think if you look at secondary meaning, how can the color blue on a probe identify Herve as a supplier of everybody using blue? I thought there were only two or three suppliers providing this kind of probe. There are two providing argon probes, endoscopic argon probes. That's what this case is about, is it not? But there's lots of endoscopic probes that are not argon that are used for other procedures, and those, in fact, are blue as well. Mr. DeWitt, should we hear from Mr. Powers? Do you have any final thoughts for us here? The only final thought would just be to advise the Court that on the antitrust issues, there is a more recent case since the briefing, and I'd just like to give the citation of that case, Total Renal Care, Inc. vs. Western Nephrology and Metabolic Bone Disease, P.C. And the site for that is 2009, U.S. District Court, Lexis, 80821. Where is that case from? That's a district court case from the District of Colorado, and it discusses the antitrust issue, the same antitrust issue about primetime 24 as we discussed here, and it includes a citation to a report from the FTC that also discusses this issue and advocates the position that county technology has taken. Do you agree if we reject your legal argument that we should apply the standard in primetime as opposed to period, do you concede that you failed? No, because we would say... Do you think you win under either standard? With respect to Irby, I would say yes. With respect to Conrad, I would say no. Thank you. Thank you, Mr. DeWitt. Mr. Powers. May it please the Court, John Powers. I represent Conrad Corporation. I think properly configured, we are a cross appellee. We are not an appellee to Irby's appeal and are an appellee to only a portion of Kennedy Technologies. So you're here just to defend the antitrust disposition? Yes, Your Honor. And there's one claim at issue that's been appealed, and that's Counterclaim 5. It alleged a conspiracy to violate Section 1 and 2 of the Sherman Act. And Judge Ambrose correctly found, after applying the PRE standard, that that claim could not survive summary judgment on the evidentiary showing, on the evidentiary record submitted by Kennedy Technologies. Was Kennedy Technologies burden-proof on those issues, as well as the standard antitrust issues, which were also challenged? Now, I think the counsel's concession is important, the concession that was just made, which was, if PRE is applied, Judge Ambrose's decision is correct. And so the main thrust of Kennedy Technologies... Well, I think you've been involved, too, with respect to Irby. Yes, I don't represent Irby, Your Honor. I only represent Conrad Corporation. The main thrust of the appeal, as it relates to Conrad Corporation, asks this Court to take two precarious steps. First, it asks it to adopt the standard that was first articulated by the Ninth Circuit in the U.S. POSCO decision. It was later adopted by the Second Circuit in the Primetime 24 decision. The second precarious step is to apply that case to this situation. In U.S. POSCO, as argued by Kennedy, prescribed a relaxed standard for sham litigation, different from PRE. PRE is, of course, from the Supreme Court. And in POSCO, there were 29 different litigations filed. In the POSCO Court, the Ninth Circuit held, we don't need to assess the individual merit of every one of these filings. It's enough that these filings as a series were taken for some proper purpose. Doesn't that make some sort of intuitive or policy sense to you? Absolutely not, Your Honor. And this is what POSCO noted. POSCO noted it may be that some of these claims are meritorious. That may be by chance. But it still found that antitrust liability could attach to that conduct, at least in part. That's a valid claim. How many different litigations were brought by CONMED against Kennedy? One, Your Honor. And that would be this claim, this one claim in this case. There's been a reference to an arbitration. Kennedy Technology wasn't a party to that arbitration. That was an arbitration between Dr. Kennedy and a separate company. Now, even if you include that arbitration, that's still only two. The Amaral decision from the Ninth Circuit, which was a clarification of POSCO. Why shouldn't we consider the separate claims that are asserted rather than your single lawsuit that you are proud to say is the only one? If Your Honor is referring to Kennedy's attempts to parse out the individual claims in this action as separate litigations, those claims CONMED was not a party to, and the record is undisputed that it played no part in the decision to bring those claims. That's the undisputed record. There is no countervailing facts. So the only claim in the record that CONMED has brought against Kennedy Technology is this one claim. And I want to make a couple points about POSCO and why it shouldn't be the rule of the Federal Circuit. This circuit has always held that PRE is the standard to be applied in the sham litigation context. It has not adopted U.S. POSCO. It has not cited it with approval. And it hasn't rejected it either. Maybe it's just never been, that question has never been before us. Are you clear that it has been and we've rejected it? To my knowledge and based on my research, you have not rejected it. But I would also add this. POSCO and PRIMETIME didn't involve patent infringement claims. And this court has held in the past that there is a separate antitrust immunity that's conferred by the Patent Act. In other words, the statutory right to enforce a patent is going to have anti-competitive effects. And this case is repeatedly recognized that enforcing statutory rights to enforce a patent confers antitrust immunity. There are two exceptions, Walker Process Fraud and sham litigation. Walker Process Fraud is not at issue in this case. The sham litigation standard is PRA. It's the same standard as Noah Pennington. So you have competing interests under the Patent Act that also are at play here. And what the natural extension of what the plaintiff is suggesting is that there could potentially be antitrust liability attached to a series of patent infringement claims where one or more of those claims is objectively meritorious. It's not baseless. And that would also violate the patent. Except doesn't the primetime standard require that this series of cases have been brought without regard to whether the challenges had merit? So it's not, I mean, if somebody really thinks that all of these challenges or most of them have merit, that wouldn't pass muster under primetime, would it? What I think the primetime case does is it removes the first prong of PRA, which is an objective prong. And it relies only on the subjective intent of the person bringing the claims. And in so doing, it recognizes that potential meritorious claim, if brought for the wrong reasons, can still be shammed. That's not the law of the Supreme Court in PRA. It's not the law of this circuit, and it shouldn't be. Because the natural extension of that is that there could be a potential meritorious patent infringement claim that is the subject in part of antitrust liability. Now, that's a difficult question. It's not one that you need to reach. Because U.S. POSCO doesn't apply to the facts of this case anyway, even if you were to adopt it. And U.S. POSCO applied to 29 pieces of litigation. As we've mentioned, there was only one. There was only one litigation. But we have to reach this issue with respect to Irby as well as to Conrad, right? I mean, you're right. Your client may be off the hook, but don't... And I don't want to throw Irby under the bus. But, you know, my interest here is why this doesn't apply. But my interest is in figuring out what we have to do. And I understand. I'm not clear that we would be able to avoid the issue entirely. Maybe with respect to your client, but not with respect to this case. And I would say the considerations that I just mentioned, counsel, against adopting U.S. POSCO is the law of the Federal Circuit. Thank you, Mr. Powers. Mr. Hampton, you have three minutes. Thank you. I'll first address a couple of issues raised by Mr. DeWitt. One thing the Court needs to take note of is the fact that the Kennedy patent never describes low flow rate. It never describes the nature of the flow coming out of its probes. And so, therefore, Kennedy's disclosure of 1 to 12 in a lot of ways isn't really germane, and that was the purpose of the office action response. And off that response, there was never any disclaimer of any particular flow rate. We just say that you can't have laminar jets. Mr. DeWitt talked about the report of Mr. Walbring. That report is a little shallow because it doesn't say which size probes and, as I said, you know, depending on the radius of the probe, you could have a difference of a factor of six as to whether or not something's coming out laminar or something's coming out non-laminar even at the same flow rate because the flow velocity and flow rate will vary by a factor of six. Dr. Aquas did testify that he used a probe at 1.6, but he never testified as to the quality of the flow coming out. So we don't know if Dr. Aquas at 1.6, that flow rate was actually a laminar flow or a non-laminar flow. Once again, Irby has never disclaimed any particular flow rate. It only disclaimed the fact that the flow emanating from its probes was non-laminar, non-directed. On the trademark issues, there's only one piece of evidence that Kennedy had, and that is a third-party brochure which states that blue color enhances positive endoscopic identification at the tip. That is the bulk of their evidence saying that. Well, do you agree with Mr. DeWitt about who had the burden to prove what in this context? Well, one of our issues with Judge Ambrose is that she clearly weighed the evidence, which she shouldn't do on Assam Judge Ambrose. We put forth enough evidence that we believe this issue should go to the jury. And that consisted of the declaration? That consisted of the declaration. It also rebutted some of the other testimony that Mr. DeWitt used. He talked about the fact that there's a lot of blue probes out there, but that has nothing to do with whether or not for argon plasma coagulation probes the color blue is Irby's. In fact, the Patent and Trademark Office has issued other trademark registrations for blue catheters. So clearly the PTO understands that depending on how you use the blue catheter, that maybe blue can qualify as a trademark. So I think there's evidence. Again, I agree with Judge Newman about the effect of the supplemental registration. We only had to show secondary meaning. This is a company that's been using the color blue on medical devices for 30 years. Matter of fact, we actually have a different trademark registration that drives people to the blue color. We use the tagline on our advertisements, the true blue probe for argon plasma coagulation, because it is difficult to show that the customer equates that color with your product. And one of the ways that the PTO recognizes that you can do this is by having advertisements directed to the color. So when it comes to antitrust issues, real quickly, there are only four lawsuits that Irby filed against Dr. Kennedy. This lawsuit, the related ITC case, which has similar facts, and there is a collection action because Dr. Kennedy sued Irby in the U.K. law, so we tried to collect our money that the court ordered here. And there's a false marking claim. Now, we tried to add the claims of the false marking case into this case, but Kennedy objected, so we had to file a new lawsuit. And that false marking lawsuit was actually settled, and Dr. Kennedy agreed to stop falsely marking. So we don't believe that there are enough cases. And also, on the issue of Judge Russell and— Any final thoughts here, Mr. Hampton? The issue as to whether or not—I lost my train of thought. Thank you. Sorry for interrupting. Thank you, Mr. Hampton. Mr. DeWitt, you have one minute. Thank you, Your Honor. My rebuttal comments will be limited to the antitrust issues that have been discussed. First, I'd point out that Mr. Hampton, or Mr. Powers, takes the position that this court should not follow the reasoning of U.S.S. POSCO and Primetime 24. We would take the opposite position. We have two circuit courts that have adopted this reasoning now and no circuit courts that have rejected it, and so we would ask that this court adopt it as well. Second thing is Mr. Powers suggests that there should be a special patent rule so that this analysis from U.S.S. POSCO and Primetime 24 would not apply to patent cases. And we would disagree with that for the reason that I think came up in one of the questions from the court, that the test in Primetime 24 requires that the cases be brought without any regard to the merit. So we think that it wouldn't cause any problem at all for patent cases. And here, in fact, with respect to the 175 patent, we had very good evidence that it was brought without any regard to the merit. We have correspondence between the CEO of UrbA USA and the in-house counsel of ConMed where UrbA receives Kennedy Technologies' advertising materials. The next day, he sends a letter saying, we want you to waive all of the provisions that require you to do a pre-filing investigation and let us file a suit immediately. And the next morning, the ConMed attorney writes back and says, yes, we agree to go ahead and sue them. So we would say that that test from Primetime 24 should apply. Final comments here, Mr. DeWitt? Yes, Your Honor. We think that that provides adequate safeguards. Thank you very much. Thank you.